IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

IN RE:

| | | |
|---|---|---|
| MICHAEL WEISEL and | : | Case No. 06-25304-TPA |
| LORI SUE WEISEL, | : | |
| *Debtors* | : | Chapter 13 |

| | | |
|---|---|---|
| MICHAEL WEISEL and | : | |
| LORI SUE WEISEL, | : | |
| *Plaintiffs,* | : | Adversary No. 08-2195-TPA |
| | : | |
| v. | : | |
| | : | |
| DOMINION PEOPLES GAS | : | |
| COMPANY, | : | |
| *Defendant.* | : | |

*Appearances:*  David A. Colecchia, Esq., for the Plaintiff
John P. Vetica, Jr., Esq., for the Defendant

**<u>MEMORANDUM OPINION AND ORDER</u>**

Currently pending before the Court is the ***Motion for Summary Judgment*** filed by

Movant, Dominion Peoples Gas Co. ("Dominion"), at Document No. 23 ("Motion").  The issue in

this case is whether a residential natural gas utility, Dominion Peoples Gas Company, can

unilaterally terminate gas service to the Chapter 13 Debtors' home based on postpetition, unpaid

bills, or whether it was first required to seek relief from stay or an increased adequate assurance

payment requirement from this Court.  For reasons explained in detail below, the Court finds that

under the facts of this case, Dominion was not required to obtain any type of relief from the Court

before terminating the Debtors' gas service based on the described postpetition deficiencies.

1

Accordingly, summary judgment will be granted in favor of Dominion.[1]

## FACTS AND PROCEDURAL HISTORY

Debtors filed their Chapter 13 petition on October 26, 2006, listing an unsecured, non-priority debt owed to Dominion  in the amount of $1,203.40 for pre-petition utility services. Debtors filed their proposed Plan on November 13, 2006, with $1 devoted to general, unsecured creditors.  *See* Document No. 7.   On December 21, 2006, the Plan was confirmed on an interim basis.  On March 15, 2007, the Plan was finally confirmed with a monthly Plan payment requirement of $1,540.[2]

On April 30, 2008, Debtors initiated the instant matter by filing an *Expedited Complaint for Violation of the Automatic Stay* ("Complaint") against Dominion. The *Complaint* alleged that on April 9, 2008, Dominion terminated Debtors' gas service without first having obtained relief from stay.  Debtors characterized Dominion's actions as "illegal" in that such conduct constituted a violation of the automatic stay and an attempt to exercise "dominion and control" over property of the bankruptcy estate, i.e., the Debtors' wages and home. *Complaint* ¶10.  Debtors asked

---

[1]    The Court's jurisdiction under *28 U.S.C. §§157* and *1334* was not at issue.  This is a core proceeding pursuant to *28 U.S.C. §§157(b)(2)(A)* and *(O)*. This *Memorandum Opinion* constitutes the Court's findings of fact and conclusions of law pursuant to *Fed.R.Bankr.P. 7052*.

[2]    Unlike other jurisdictions, for a number of years it has been customary in the Pittsburgh Division of this Court for postpetition utility obligations to be included as part of the Chapter 13 Plan relegated to a "long term continuing debt" status paid at "Level Five" on the official Plan form.  Dominion has decided not to participate in that process.  Therefore,  its customers who go into Chapter 13 bankruptcy pay postpetition bills directly to Dominion rather than to the Chapter 13 Trustee for subsequent distribution to the utility.  This *Memorandum Opinion and Order* is limited to its facts and should not be viewed as stating any conclusion with respect to the rights and obligations of debtors and utilities in cases where charges for postpetition service by the utility are included as part of the Chapter 13 Plan.  Such cases may present issues of *res judicata*, waiver, or estoppel that are not present here.

the Court to find that Dominion violated the stay, to order gas service restored, and to award attorney fees, actual damages, and punitive damages. On May 1, 2008, the Court entered an Order scheduling a hearing for May 6, 2008.

At the scheduled hearing no representative of Dominion appeared apparently due to the failure of Debtors' Counsel to make proper service as required in the May 1, 2008 Order. Nevertheless, based on the allegations in the *Complaint* and the perceived exigency of the circumstances, the Court entered an interim order that required Dominion to immediately restore gas service to the Debtors until further order and scheduled a preliminary hearing on the *Complaint* for May 21, 2008. *See* Document No. 6.

At the May 21st preliminary hearing both Parties were represented. Debtors' Counsel reported that the gas had been turned back on as ordered. He proposed that an amended Plan be filed increasing the amount of the Plan payment to take care of the then-accumulated postpetition arrearage owed to Dominion. Debtor husband was present and affirmed his ability to pay an extra $200 to $225 per month for that purpose. There also was an issue raised as to whether Dominion had followed the proper procedure under applicable Pennsylvania public utility law to effect termination of the gas service. Debtors' counsel questioned whether the notices required by state law had been sent out by Dominion prior to the shut-off. Dominion's attorney stated that the postpetition balance due was $1,157.09. He said default notices were sent out in February and March of 2008 before the gas was turned off in April. He also said Dominion was willing to work on a payment plan with the Debtors.

3

Based on the representations made at the preliminary hearing on May 28, 2008, the Court issued a Pretrial Scheduling Order confirming the Parties' agreement that the only issue in the case was the legal one of whether Dominion had appropriately complied with its duties under *11 U.S.C. §366* before it terminated the gas service. *See* Document No. 16. The Order noted that the Parties had therefore agreed to present the matter to the Court by stipulation, with one exception, that is, Debtors disputed they had ever received prior notice of Dominion's intent to terminate service. Dominion was thus to provide copies of the notices to the Debtors but no further discovery was contemplated. All preliminary motions, including any motions for summary judgment, were to be filed by June 24, 2008. The Court also ordered Debtors to pay $200 to their attorney each month toward postpetition utility arrearages underlying the purpose for originally filing the *Complaint* and to be held by him pending further Order of Court.

On June 23, 2008, Dominion filed its *Motion* with an accompanying Memorandum of Law and an Affidavit signed by Pamela Swansey, the Credit Administrator for Dominion, along with extensive attached exhibits. On July 12, 2008, the Parties filed a *Consolidated Pretrial Statement*, Document No. 35, setting forth a fairly extensive listing of facts upon which the Parties agreed. On August 3, 2008, the Debtors filed a *Response* to the *Motion*, as well as a *Memorandum* in opposition to the *Motion. See* Document Nos. 50, 56. Further demonstrating the lack of any significant factual dispute, the Debtors' *Response* admitted 35 of the 37 paragraphs set forth in the *Motion*, the only exceptions being Paragraphs 2 and 3 of the *Motion* which set forth the legal relief being sought by Dominion.[3]

---

[3] Although they never actually filed a separate motion for summary judgment, in responding to Dominion's *Motion,* the Debtors nevertheless attempted to assert that they were entitled to summary judgment. *See* Document No. 50 at p. 16. Dominion objected that this was contrary to the pre-trial scheduling order that required any summary judgment motions to be filed by June 24,

The agreed upon facts of this case are not complicated.  Prior to the bankruptcy the Debtors had an account with Dominion, Account No. 7460601283662 ("Prepetition Account"), for gas services to their residence in Latrobe, Pennsylvania.  After the Debtors filed their bankruptcy petition on October 26, 2006, Dominion closed the Prepetition Account so that all utility charges prior to the petition date were included therein.  Dominion was authorized to do so pursuant to the "Dominion Rates and Rules" that govern the relationship between Dominion and its customers, *See Swansey Affidavit*, Ex. A-2, ¶6, Document No. 23.  The Debtors have not challenged Dominion's actions in that regard.  Thereafter, Dominion continued service to the Debtor postpetition, opening a new account with the Debtors, Account No. 7500030687738 ("Postpetition Account"), which started with a $0 balance as of the petition date.  Debtors took no steps to furnish adequate assurance of payment to Dominion during the 20 day period after filing their petition.  On November 18, 2006, Dominion mailed a letter to the Debtors seeking a $217 postpetition deposit to be paid by December 22, 2006, due to the bankruptcy filing.  *Swansey Affidavit*, Ex. A-4, Document No. 23.  The Debtors tendered a $215 postpetition deposit that was received and accepted by Dominion on December 18, 2006 and held in the Postpetition Account.  No Court involvement took place concerning the creation of the postpetition deposit between Dominion and the Debtors.

Aside from their submission of the deposit,  payments by the Debtors to Dominion on the Postpetition Account were sporadic and delinquent from the start.  The details are spelled out

---

2008. *See* Document No. 59.  The Court agrees that Dominion's objection was well taken, and that any summary judgment "motion" claimed to have been filed by the Debtors was untimely.  Furthermore, motions for summary judgment must be raised by separate pleading and not "buried" in a response to another motion.  *See: In re W.R. Grace & Co.*, 2008 WL 4571559 *1 n.2 (Bankr. D. Del., October 14, 2008)*.  The objection proves to be essentially moot in any event because of the Court's determination that summary judgment should be granted for Dominion.

in the facts to which the Parties have stipulated and need not be repeated here.  By October 2007 the

Debtors' delinquency on the Postpetition Account had reached over $800.  In addition to the normal,

October bill, Dominion also mailed the Debtors a "10-Day Residential Shut-Off Notice" warning

them that their service could be shut off by October 30, 2007, unless the bill was paid or payment

arrangements were made.  Dominion also attempted to contact the Debtors by phone on October 19,

2007, leaving a message on their answering machine.  A similar notice was sent and two more phone

calls were made in November 2007.  Despite these actions the Debtors' delinquency on the Post-

petition Account continued to climb.  In February and March 2008, Dominion again sent 10-Day

Residential Shut-Off Notices to the Debtors and made efforts to contact them by telephone.

Dominion terminated gas service to the Debtors on April 9, 2008, for non-payment.  A few weeks

later, the Debtors filed the *Complaint*.


### *SUMMARY JUDGMENT STANDARD*


For purposes of resolving a summary judgment motion, *Fed.R.Civ.P. 56* is made

applicable to adversary proceedings through *Fed.R.Bankr.P. 7056*.  Summary judgment is

appropriate if the pleadings, depositions, supporting affidavits, answers to interrogatories and

admissions that are part of the record demonstrate that there exists no genuine issue of material fact

and the moving party is entitled to judgment as a matter of law. *Fed.R.Civ.P. 56(c), Celotex Corp.

v. Catrett,* 477 U.S. 317, 322 (1986).  Summary judgment is appropriate if no material factual issue

exists and the only issue before the Court is a legal issue. *Earth Data Int'l of N.C., L.L.C. v. STV,

Inc.*, 159 F. Supp.2d 844 (E.D. Pa. 2001); *In re Air Nail Co., Inc.*, 329 B.R. 512 (Bankr. W.D. Pa.

2005).  The test under *Fed.R.Civ.P.* 56 is "whether the moving party is entitled to judgment as a

6

matter of law." *Med. Protective Co. v. Watkins,* 198 F.3d 100, 103 (3d Cir. 1999) (quoting *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir. 1994)).  In deciding a motion for summary judgment, the Court must construe the facts in a light most favorable to the non-moving party. *United States v. Isley*, 356 F.Supp.2d 391 (D.N.J. 2004).  Once the moving party satisfies its burden of establishing a *prima facie* case for summary judgment, the non-moving party must do more than raise some metaphysical doubt as to material facts.  *Boyle v. County of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586(1986)).  No issue for trial exists, in fact, unless the non-moving party can adduce sufficient evidence favoring it on the disputed factual issue such that a reasonable jury could return a verdict in its favor. *See Celotex,* 477 U.S. at 322.

### *DISCUSSION*

The narrow issue presented by the *Motion* is whether Dominion was permitted to unilaterally terminate gas service to Debtors based on postpetition unpaid bills, or, whether it was required to first go to Court to either seek relief from stay pursuant to *11 U.S.C. §362(d)* or an increased deposit requirement pursuant to *11 U.S.C. §366(b)*.  Dominion argues that it had a right to terminate the Debtors' gas service due to their non-payment of postpetition bills without the need to seek prior approval of Court so long as Dominion followed applicable Pennsylvania state law in doing so.  Debtors argue that once they made an adequate assurance payment to Dominion ( *i.e.*, the December 18, 2006 deposit of $215), Dominion lost the ability to act unilaterally without Court approval.  According to the Debtors, in a Chapter 13 case such as this, once a utility has received a postpetition adequate assurance payment, thereafter, when faced with the debtor's non-payment

7

of postpetition bills, the utility may not act unilaterally to terminate service but instead must go to court and either ask for an increase in adequate protection under *11 U.S.C. §366(b)*, or in the alternative, seek relief from stay.

*11 U.S.C. §366(a)* provides the general rule that a utility may not alter, refuse, or discontinue service to a debtor "solely on the basis of the commencement of a case under this title or that a debt owed by the debtor to such utility for service rendered before the order for relief was not paid when due." This general rule, however, is subject to the conditional language set forth in *Section 366(b)*, which provides:

> **(b)** Such utility may alter, refuse, or discontinue service if neither the trustee nor the debtor, within 20 days after the date of the order for relief, furnishes adequate assurance of payment, in the form of a deposit or other security, for service after such date. On request of a party in interest and after notice and a hearing, the court may order reasonable modification of the amount of the deposit or other security necessary to provide adequate assurance of payment.

*11 U.S.C. §366(b).* By its language, *Section 366(b)* is self-executing and no formal proceeding by the utility is necessary to invoke the adequate assurance requirement. *See, e.g., In re Carter*, 133 B.R. 110, 112 (Bankr. N.D. Ohio 1991); *3 Colliers on Bankruptcy* ¶366.06 (15th Ed. Rev. 2008). *See also Begley v. Philadelphia Elec. Co.*, 760 F.2d 46, 50 (3d Cir. 1985) (noting that, at least in a Chapter 7 setting, *Section 366(b)* has no provision limiting a utility's freedom to act based on postpetition arrearages); *In re Jones*, 369 B.R. 745, 752 (1st Cir. BAP 2007) (in reliance on *Begley, supra,* finding that *Section 366* posed no impediment to a termination of service by a utility without first obtaining relief from stay in a pending Chapter 13 proceeding.) Furthermore, the anti-discrimination language of *Section 366(a)* is "subject to" the language of *Section 366(b)* in the sense

that a utility is entitled to adequate assurance of payment under *Section 366(b)* regardless of the

debtor's prepetition payment history or whether the utility generally requires new customers to post

a deposit. *See, In re Hanratty*, 907 F.2d 1418, 1423 (3d Cir. 1990).[4]   As indicated above, the Parties

have differing views on how this provision may affect a utility's ability to terminate service to a

debtor for non-payment for utility services rendered postpetition.   Before that question may even

be considered, however, the Court perceives a more fundamental issue that presents itself, even

though it was not raised by the Parties.

It is readily apparent that the Debtors did not furnish adequate assurance of payment

in the form of a deposit or other security within 20 days of the order for relief.   In a voluntary

Chapter 13 case like this, the date of filing of the petition is the date of the order for relief.   *See 11*

*U.S.C. §301(b)*.   The Debtors filed their petition on October 26, 2006.   Thus, pursuant to *Section*

*366(b)*, adequate assurance of payment was required to be "furnished" by November 15, 2006.   In

fact and as previously noted, the Debtors took no steps whatsoever toward effectuating the creation

of a *Section 366(b)* deposit within the statutory 20-day period.   The record reflects that demand for

the payment by Dominion was not made until after the 20-day period had run.   Remittance of the

deposit was finally made by the Debtors to Dominion on December 18, 2006, 53 days after the order

for relief.   By the clear terms of *Section 366(b)*, effective in this case as of November 16, 2006, the

Debtors lost whatever statutory protection against termination by Dominion that they would have

---

[4]      Although many of the cases cited in this *Memorandum Opinion* were decided prior to the passage of the *Bankruptcy Abuse Prevention and Consumer Protection Act of 2005* P.L. 109-8, §256, 119 Stat. 23, *11 U.S.C. §101 et seq.* ("BAPCPA"), which made extensive changes to the Bankruptcy Code, that enactment does not change the Court's decision in this matter or reliance on the cited cases. *11 U.S.C. §366* was substantively unaffected by *BAPCPA* except for the addition of a new subsection, designated §366(c), which better defines what is meant by an adequate "assurance of payment" and provides some special rules for Chapter 11 cases.   The reasoning of any pre-*BAPCPA* cases cited by the Court thus remains valid with respect to the issue presented here.

9

been afforded under *Section 366(b)* had they acted timely.  *See, e.g., In re Penn Jersey Corp.* 72,

B.R. 981 (Bankr. E.D. Pa. 1987) (if debtor fails to negotiate terms of adequate assurance within 20

days debtor is virtually at the mercy of the utility); *In re Marion Steel Co.*, 35 B.R. 188 (Bankr. N.D.

Ohio 1983) (once 20 day period has passed the utility is in the driver's seat and may discontinue

service as it sees fit). *In re Jones,* 369 B.R. at 748, citing *In re Penn Jersey Corp., supra.*

It is no answer to this issue by pointing to the lack of any action on Dominion's part

during the 20-day statutory period allowed for receipt of a deposit from the Debtors.  The statute

imposes no such burden on utilities.  Nor does the November 18, 2006 letter from Dominion to the

Debtors serve as a basis to somehow extend the 20-day period.  That letter was not sent until after

the 20-day statutory period expired.  As such, it cannot be argued that the letter somehow lulled the

Debtors into the mistaken belief that they would receive an extended period of time to submit a

deposit and maintain the protection of *Section 366(b).*

The Court is aware that at least one court has held that the 20-day period is not

absolute.  *See In re Allen*, 69 B.R. 867, 874 (Bankr. E.D. Pa. 1987) (reading *Section 366(b)* as

allowing a debtor to submit the adequate assurance payment at any time after the order for relief and

thereupon receive utility service, at least from the date of the payment forward).  This Court

respectfully disagrees with that conclusion.  The statutory language is clear and unambiguous in

providing that adequate assurance of payment must be "furnished" within 20 days of the order for

relief or the utility will be free to alter, refuse or discontinue service.  When the meaning of a statute

is plain the Court's responsibility is to apply it according to its terms.  *See Lamie v. U.S. Trustee*,

540 U.S. 526, 534 (2004).  Thus, once the 20-day period ending November 15, 2006 concluded

without the Debtors having done anything toward furnishing adequate assurance of payment to Dominion, by its own terms, the initial clause of *Section 366(b)* was triggered thereby removing any Bankruptcy Code-based impediment to Dominion's ability to terminate the service.[5]

Of course, nothing in *Section 366(b)* requires a utility to discontinue service if adequate assurance of payment is not furnished within the 20 day period. In such circumstances the utility may voluntarily elect to continue providing service to the debtor and should be free to do so without thereby being found to have somehow resurrected and once again become subject to the strictures of *Section 366(b)* as if a timely adequate assurance of payment had been furnished by the debtor.

That is precisely what occurred in the present case. The Debtors did not enjoy any protection afforded by *Section 366* when Dominion terminated service to them because they had not furnished a timely adequate assurance of payment as required by the statute. Therefore there is no basis for their claim that Dominion violated any duty allegedly owed them by failing to seek relief from stay or a modification of adequate assurance of payment in this Court prior to doing so.[6] That

---

[5]  On its face, *Section 366(b)* is unclear as to the exact meaning of "furnishes adequate assurance of payment" within the 20 day period. A strict reading of the statute would require the debtor to actually tender payment in an amount acceptable to the utility or file a motion for protective order with the Court within the 20 day period. *See, e.g., In re Whitaker,* 84 B.R. 934, 944-45 (Bankr. E.D. Pa. 1988). The Court recognizes that the final terms and payment of the *Section 366(b)* deposit may not always be completed or remitted within the 20 day statutory period. At minimum, good faith attempts at entering into "adequate assurances" must at least be commenced during that time. A more relaxed reading might find, for example, that a debtor can meet the obligation to furnish adequate assurance of payment by at least offering to tender a reasonable amount within the 20 day period, even though actual payment thereof is delayed beyond the 20 day limit due to negotiations with the utility. The Court need not decide which approach is correct in this case because it is undisputed that Debtors did nothing in the 20 day period.

[6]  This is not to suggest that the Debtors were therefore at the complete whim of Dominion with respect to the service provided once the 20-day statutory period ended. Dominion remained obligated to follow applicable state law with respect to the provision of service and the termination thereof, as well as the "Dominion Rates and Rules" which Dominion has filed with the Pennsylvania Public Utility Commission. Presumably, if the Debtors had not been delinquent on the Postpetition Account, or had they worked out a payment arrangement to eliminate the arrearage on the Postpetition Account, Dominion would have had no lawful basis to terminate the service. *See Begley v. Philadelphia Elec. Co.,* 760 F.2d 46, 51 (3rd Cir. 1985) (state procedural protection provided to utility customers are not abrogated by *Section 366(b)* adequate assurance provision).

11

in itself is a sufficient basis for granting summary judgment in favor of Dominion.  However, in

recognition of the fact that at least one other court would apparently treat the Debtors' December

18, 2006 payment of the deposit as sufficient to cloak them with the protection of *Section 366(b)*

(*see Allen, supra)*, the Court will proceed to consider the Parties' arguments as if that were in fact

the case.

Several leading bankruptcy treatises agree with and support Dominion's position that

*Section 366(b)* does not require relief from stay before utility service can be terminated:

> The provision of adequate assurance does not prevent a utility from
> terminating service to the debtor or estate if postpetition payments for utility
> service are not made.  Such a termination must follow the procedure
> prescribed under non-bankruptcy law for utility terminations, which may
> include various protections for the debtor or for tenants of the debtor.

3 *Collier on Bankruptcy* ¶366.03[1] (15th Ed. Rev. 2008).  *See also Lundin*, Chapter 13 Bankruptcy,

3d. Ed. at §437.1 (2000 & Supp. 2007-1).

Among the cases cited in *Collier* as authority for that conclusion, and one on which

Dominion heavily relies in support of its position, is *Begley v. Philadelphia Elec. Co.,* 760 F.2d 46

(3d. Cir. 1985).  Although it was a Chapter 7 case, the relevant facts are otherwise similar to the

present case and *Begley* is instructive when considered under the facts of this case.

The debtors in *Begley* were substantially indebted to the utility for pre-petition

arrearages. After they filed their bankruptcy petition the utility demanded, and debtors paid, an

adequate assurance deposit of $312.  The debtors subsequently failed to pay postpetition bills and

accrued a postpetition arrearage of almost $600.  The utility applied the deposit against that

12

arrearage and then "posted" the account for termination.  At that point, the debtors forestalled the termination by making a payment to the utility.  Further, postpetition arrearages accrued thereafter and the debtors sought relief through the Pennsylvania Public Utility Commission ("PUC") which has regulations providing that prior to termination, a ratepayer must be given the opportunity to amortize arrearages through a payment plan.  The PUC dismissed the debtors' complaint, finding that its jurisdiction was preempted by the Bankruptcy Code.  The debtors then filed for injunctive relief in the bankruptcy court, seeking among other things an order to prevent the utility from terminating service.  The court made a decision largely favorable to the debtors, and the utility appealed.

On appeal the utility argued that the Bankruptcy Code pre-empted PUC procedures.  The Third Circuit rejected that argument, explaining the working of *11 U.S.C. §366* as follows:

> The inclusion of these provisions in the Bankruptcy Code was designed to clarify the bankruptcy court's power to prevent a utility from using its termination power to enforce payment of pre-petition debts, as long as adequate security for payment of future bills is provided to the utility. *See* 2 Collier on Bankruptcy at ¶¶ 366.01-.03 (15th Ed.1984). By the terms of section 366, a utility may not terminate the debtor's service for failure to pay pre-petition arrearages, but may terminate the debtor's account if the debtor fails, within twenty days, to post adequate assurance of payment for post-petition services.

> Section 366 is silent, however, as to the utility's right to terminate where, as in this case, adequate assurance was posted initially, but subsequent obligations in excess of the amount of assurance were unpaid. Initially, we must determine whether the utility's sole remedy in such a situation is to seek from the bankruptcy court an increase in the amount of assurance, as provided in section 366(b), and terminate only upon failure of the debtor to post such assurance, or whether the utility may seek termination immediately upon failure of the debtor to pay a post-petition bill, as PECO here seeks to do.

> The restriction on termination in section 366(a) bars only those terminations which issue "solely on the basis" that a debt incurred *prior* to the

bankruptcy order, was not paid when due. Thus, by implication, termination for failure to pay post-petition bills would not seem to be barred by section 366(a). Accordingly, courts setting the amount of "adequate assurance" have considered the length of time necessary for the utility to effect termination once one billing cycle is missed. *See In re Santa Clara Circuits West, Inc.,* 27 B.R. 680 (Bkrtcy.D.Utah 1982); *In re Stagecoach Enterprises, Inc.,* 1 B.R. 732 (Bkrtcy.D.Fla.1979). This reflects an understanding that the utility will be allowed to commence termination procedures once a post-petition payment is missed, despite the prior security or "assurance" deposit.

We believe that such an approach is consistent with the purpose and policy of section 366, which is to prevent the threat of termination from being used to collect pre-petition debts, while not forcing the utility to provide services for which it may never be paid. *See In re Security Investment Properties, Inc.,* 559 F.2d 1321, 1325 (5th Cir.1977); *In re Penn Central Transportation Co.,* 467 F.2d 100, 102 (3d Cir.1972); 2 Colliers on Bankruptcy at ¶ 366.01 (15th Ed.1984). We thus hold that in a Chapter 7 proceeding, the appropriate course for a utility, upon non-payment of post-petition bills, is to seek termination of services, not to seek an increased amount of security in the bankruptcy court. Indeed, the Begleys concede as much, arguing not that termination is an inappropriate remedy, but rather that termination must be sought according to generally applicable Pennsylvania procedures.

*Begley v. Philadelphia Elec. Co.* 760 F.2d 46, 48-49 (3d Cir.1985) (footnote omitted).  Having thus concluded, the court went on to also decide that the Bankruptcy Code does not pre-empt state law regarding termination of utility service.  The court also found that once a debtor allows postpetition utility debts to become delinquent, so that the utility may commence termination proceedings, the bankruptcy court's jurisdiction over the issue of adequate assurance under *Section 366(b)* is no longer relevant because the adequate assurance provision "no longer has vitality." 760 F.2d at 50.

Although the *Begley* court was careful to note that its holding was limited to the "narrow" context of a Chapter 7 case (760 F.2d at 50), in which the bankruptcy court has no jurisdiction over the debtor's postpetition wages, no compelling reason appears under the facts of this case as to why the result would be any different in a Chapter 13 case.

14

In *In re Jones,* 369 B.R. 745 (1ˢᵗ Cir. BAP 2007) a Chapter 13 debtor sought sanctions against a utility for terminating service based on her failure to pay postpetition bills.  The debtor argued that this termination was a violation of the stay.  In its opinion, the court began by citing *Begley* for the proposition that the purpose of *Section 366* is to prevent the threat of termination from being used to collect prepetition debts, while not forcing the utility to provide service for which it might never get paid.  It then examined the "small body of case law" on point and concluded that *Section 366(b)* has been read as an exception to the automatic stay allowing a utility to refuse or discontinue service for failure to provide adequate assurance of payment without recourse to a bankruptcy court.  *Supra* at 748.  It also noted that courts have "logically segued" from that position to the conclusion that failure to make postpetition payments is likewise a ground for a utility to terminate service without first requesting permission from the bankruptcy court, stating "[h]ence, courts have routinely allowed utilities to terminate service for postpetition delinquencies without obtaining relief from stay."  369 B.R. at 749.  *See also, e.g., In re C.T. Harris, Inc., 295 B.R. 405* (Bankr. M.D. Ga. 2003*)* (an adequate assurance payment by a Chapter 11 debtor to a utility did not prevent that utility from terminating service if postpetition payments for service were not made so long as any such termination was done pursuant to applicable non-bankruptcy law)*; Robinson v. Mich. Consol. Gas Co., Inc.,* 918 F.2d 579, 588 (6ᵗʰ Cir. 1990); *In re Sheehan Memorial Hosp.*, 301 B.R. 777 (Bankr. W.D. N.Y. 2003) (utility in Chapter 11 case could unilaterally discontinue service for non-payment of postpetition bills pursuant to *11 U.S.C. §366(b)); In re St. Torrance,* 2007 WL 2781108 (6ᵗʰ Cir. BAP 2007);  *In re Webb,* 38 B.R. 541 (Bankr. W.D. Pa. 1984).  *And see, In re Hanratty*, *supra,* (holding that in a Chapter 13 case the *Section 366* provision prohibiting discrimination by utilities against debtors did not preclude a utility from requiring customers who

15

have filed for bankruptcy to pay a deposit as an adequate assurance of payment even though new customers not in bankruptcy were not required to make such a deposit).

The Debtors counter by arguing that *Begley* should be limited to Chapter 7 cases and that once Dominion received its adequate protection deposit, the amount of which Debtors take care to point out was set by Dominion itself, it lost the ability to unilaterally terminate service without first obtaining stay relief. They further argue that Dominion's only recourse after receiving the deposit was to file a motion seeking to have the adequate assurance modified by requiring Debtors to post a larger deposit. None of the cases cited by the Debtors for these propositions is persuasive.

In support of their position, the Debtors first reference *In re Allen, supra*, where the debtor paid a deposit to a utility during a chapter 13 case. The debtor's case was then converted to Chapter 7 and the utility sought an additional deposit. The *Allen* court merely found that the utility was not permitted to seek a second adequate assurance payment from the debtor upon conversion of the case, something Dominion did not do in the present case. Contrary to the suggestion by the Debtors here, the court in *Allen* did not find that the utility had no right to unilaterally terminate utility service for non-payment of postpetition bills. In fact, the *Allen* court cited *Begley* in noting, without qualification, that the utility had another "powerful remedy" at its disposal in that it could disconnect service as a remedy for postpetition nonpayment without further recourse to the bankruptcy court. 69 B.R. at 876. Thus, *Allen* actually appears to support this Court's reading of *Begley* on this point.

Debtor next cites *In re Marion Steel, supra,* but that case arose in a completely different context than the present case. Marion Steel involved a Chapter 11 steelmaking debtor that

16

consumed a huge amount of electricity each month ($400,000 to $550,000) to operate its business.

Due to the nature of the business, a disruption to the electrical supply without sufficient advance

notice could potentially cause a serious threat to property and employees.[7]  After the debtor and its

electric utility were unable to agree on a proper adequate assurance payment the debtor filed motions

seeking to have the adequate assurance payment set by the court and to have the utility preliminarily

enjoined from terminating service.  The court entered a temporary restraining order to prevent

termination of service until a hearing could be scheduled.  In the meantime the parties agreed on an

adequate assurance payment (consisting of an initial deposit and weekly advance payments toward

the anticipated monthly bill) but they could not agree as to the methods and conditions under which

the utility had the right to terminate service if the debtor failed to make required payments.  The

utility took the position that it had a unilateral right to shut off service without prior court permission

while the debtor insisted there should be prior notice and hearing before any shut-off.

After the hearing was held the court in *Marion Steel* denied the request for a

preliminary injunction against the utility service to prevent unilateral termination because there had

been no showing of irreparable harm.  The court noted that it could reach that same result by

including a notice and hearing requirement within the terms and conditions of the "adequate

assurance of payment" it would set under *Section 366*.  *See* 35 B.R. at 200.  The court decided the

latter approach was the proper course to take, stating:

---

[7]  The Court is sensitive to that factor.  In the present case, although the gas termination undoubtedly caused the Debtors inconvenience, there is no indication that it endangered them, their family, or their property in any way.  The Debtors were provided with repeated notice that their gas service could be terminated because they were not paying their bills.  Debtor-husband was able to obtain an electric hot water tank to provide an alternative source of hot water within a short time after the termination.  The gas service resumed immediately upon the issuance of the Court's *Preliminary Order* dated May 1, 2008.

> "Considering all the facts and circumstances of this case, the Court
> concludes that the utility does not need as 'adequate assurance of payment'
> the right to unilateral shut-off in this case.  Instead, in the event of any
> default, upon contacting the Court, and upon 3 days telephonic notice to
> counsel for the debtor, the Court will convene an emergency hearing to
> consider shut-off."

*Id*.  Thus, *Marion Steel* simply stands for the proposition that if a court makes a determination of the

adequate assurance of payment under *Section 366* because the parties cannot do so themselves it can

eliminate a right of unilateral shut-off by the utility.  That is not what happened in the present case

therefore the holding in the *Marion Steel* case does not support the Debtors' position.

The final case relied upon by the Debtors is *Sharon Steel Corp. v. Natl. Fuel Gas*

*Distribution,* 872 F.2d 36 (3d Cir. 1989), which they cite for the basic proposition that a bankruptcy

court has jurisdiction to oversee the relationship between a debtor and a utility, postpetition.  872

F.2d at 41-42.  That is undoubtedly true, at least with respect to certain features of the relationship.

The issues in *Sharon Steel*, however, involved the nature of a gas service agreement between the

debtor and a utility, i.e., whether it was an executory contract that could be rejected, and related

matters.  The issue presented in this case as to whether a utility has the unilateral right to terminate

service for postpetition non-payment was not present in the *Sharon Steel* case.  Thus, the Court does

not find *Sharon Steel* to provide any support for the Debtors' position.

The Debtors make a number of other points that may briefly be addressed.  They

argue that the possibility of modification of the adequate assurance payment pursuant to *Section*

*366(b)* is intended to address situations where a debtor falls behind in postpetition billing payments,

presumably because that would tend to weaken the rationale for allowing a utility to terminate

service in these circumstances.  The Debtors' view as to the purpose of this "modification

procedure" under *Section 366(b)* does not, however, square with the *Begley* court's holding as to the intent of that provision:

> Thus, as we read section 366(b), in order to forestall discontinuation of service by a utility, the trustee or the debtor must furnish an adequate assurance of payment. If the utility or any other party in interest who is aggrieved contests the adequacy of the payment, the bankruptcy court may order a reasonable modification. Once that modification has been ordered by the bankruptcy court, no further recourse to the bankruptcy court can be had under section 366(b) by any party.

760 F.2d at 51. The *Begley* court went on to state that if the debtor defaults on postpetition payments after the adequate assurance amount has been set, the utility may seek to terminate for non-payment as its remedy. In this case the adequate assurance amount was effectively set in December 2006 and was apparently agreeable to both parties.  Under *Begley*, it is uncertain whether Dominion would even have had the ability to seek modification of the deposit amount thereafter.[8] But even if it could have done so, there is nothing to suggest in the statute or by applicable case law that seeking modification was mandatory and Dominion's exclusive remedy.

Next, Debtors point out that, unlike Chapter 7, in Chapter 13 proceedings property of the estate includes future earnings of the debtor.  *See 11 U.S.C. §1306(a)(2).*  Based solely on that proposition the Debtors seek to characterize Dominion's termination of the gas service as an improper attempt to exercise "dominion and control" over property of the estate[9] and an

---

[8]        The Court makes no determination on that point in this *Memorandum Opinion*.  Nor does the Court make any finding or determination as to what the effect may have been in this case of a timely proffer of initial, adequate assurances by the Debtors pursuant to *Section 366(b)*, what "appropriate" adequate assurances may have  been, or, Dominion's rights in the event the initial proffer of adequate assurances was exhausted postpetition.

[9]        This is apparently an allusion to *11 U.S.C. §362(a)(3)*, which provides for an automatic stay of "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate."  The Court has reviewed the entirety of *Section 362(a)* which sets forth the parameters of the automatic stay and *Section 362(a)(3)* is the only provision that could conceivably apply to what Dominion did here.

19

"unconscionable affront" to the Court's jurisdiction and mandate to police the relationship between Debtors and Dominion.  This line of argument naturally raises two questions.  Are all of the Debtors' postconfirmation earnings property of the estate vis-a-vis Dominion?  Can Dominion's termination of gas service fairly be characterized as an attempt to exercise possession or control over property of the estate?

The answer to the first question is not nearly so straightforward as the Debtors assert. It is true that *Section 1306(a)(2)* provides that "property of the estate" includes:

> (2)    earnings from services performed by the debtor after the commencement of the case but before the case is closed, dismissed, or converted to a case under chapter 7, 11, or 12 of this title, whichever occurs first.

*11 U.S.C. §1306(a)(2)*

However, the Bankruptcy Code also contains the following provision:

> (b)    Except as otherwise provided in the plan or the order confirming the plan, the confirmation of a plan vests all of the property of the estate in the debtor.

*11 U.S.C. §1327(b).*  The interplay between these provisions has spawned a fair amount of judicial opinion and scholarly comment, a rehashing of which is not necessary here.[10]

---

[10]    For examples of discussion of this issue, see: Smith, *Property of the Estate - To be or not to be?  That is the Question the Trustee Asks of thee,* 21 A.B.I. Jnl. 28 (Jan. 2003); Michaela M. White, *The Effects of Chapter 13 Plan Confirmation and Case Conversion on Property,* 26 Creighton L. Rev. 785 (1993); Note, *Modified Estate Transformation: When Does a Chapter 13 Estate Terminate,* 7 Am. Bankr. Inst. L. Rev. 213 (Spring 1999).*See also, Annotation, Continued existence of Bankruptcy Code Chapter 13 estate after confirmation of the Chapter 13 plan,* A.L.R. Fed. 665.  In general, the Courts have taken one of 3 basic approaches in reconciling these two statutory provisions on the question of what constitutes property of the estate after confirmation. Under the "estate termination" approach, plan confirmation terminates the bankruptcy estate thereby freeing postpetition creditors from the automatic stay.  Under the "estate preservation" approach, all property of the debtor, including property acquired postconfirmation, remains property of the estate after confirmation and therefore subject to the protection of the automatic stay. Under the "estate transformation" approach, upon confirmation, only property that is necessary to implement the plan remains property of the estate and continues to enjoy the protections of the automatic stay.  There are problems associated with each of these approaches.  Unfortunately no definitive guidance exists in the Third Circuit on this particular point.

As previously indicated,[11] for a number of years the Pittsburgh Division of this Court has generally provided for payment of postpetition utility obligations through the Chapter 13 plan to be distributed and paid by the Chapter 13 Trustee, not the debtor.[12]  To that end, the standard plan form, under the heading of "General Principles Applicable to all Chapter 13 Plans", clearly states:

> Property of the estate shall not re-vest in the Debtor until the bankruptcy case is closed.

*See Chapter 13 Plan*, Local Form 10, p. 5, set forth and identified on the Court's website at www.pawb.uscourts.gov/pdfs/localForms.  *See also* Document No. 7, *In re Weisel*, Case No. 06-25304.  The use of this general language is clearly intended to utilize the "except as otherwise provided" language of *Section 1327(b)* in an effort to afford debtors the maximum, postconfirmation protection possible by expanding the definition of "property of the estate" to the fullest possible extent and in the process, including all postconfirmation income of the debtor, whether actually needed to fund the plan or not.  Despite this Court's general, philosophical concerns as to whether

---

[11]     See *n. 2, supra.*

[12]     The Chapter 13 Trustee in the Western District of PA is a "conduit" trustee.  It should not be forgotten that one of the important teachings of *Begley* is that the purpose and policy of *Section 366* is to prevent the threat of termination from being used to collect prepetition debts "while not forcing the utility to provide services for which it may never be paid."  760 F.2d at 49.  Given that, it can only be assumed that the practice of paying postpetition utility obligations under the plan, particularly under the relatively low priority Level 5, is premised on the assumption that most Chapter 13 plans are successfully completed.  That premise, however, may be flawed.  Although official statistics on the success rate of Chapter 13 plans in the Western District of PA are not available, inquiries performed by the Clerk's Office indicate that where completed data is available (through year 2000) the actual success rate hovers around 30%.  Although the data remains incomplete, years 2001 and 2002 indicate similar results.  2003 fares better, preliminarily approaching a 39% success rate.  Nevertheless, it is clear that in this District the large majority of Chapter 13 cases with confirmed plans ultimately end up being dismissed or converted rather than carried out through plan completion and discharge.  This suggests to the Court that the current custom regarding payment of postpetition utility charges under the plan may not be serving the purpose and policy of *Section 366*, and perhaps, a reconsideration of that approach is appropriate.

21

it is appropriate to attempt to define the postconfirmation estate this broadly,[13] those concerns need not be squarely faced here.  Under the particular facts of this case, the Court concludes that Dominion is not bound by the terms of the Plan confirmed in this matter with respect to operation of the Postpetition Account.

All of Dominion's actions as challenged by the Debtors concern only the Postpetition Account, an obligation of the Debtors that in the Court's view did not arise until after their bankruptcy petition was filed.  Put another way, the debt represented by the Postpetition Account is a postpetition claim.  It is clear that Chapter 13 of the Bankruptcy Code provides differing treatment for prepetition claims and postpetition claims.  As to prepetition claims, the debtor effectively has the power to "force" the prepetition creditor to participate in the plan because the debtor can file a proof of claim for such creditor.  *See 11 U.S.C. §501(a), (c); Fed.R.Bankr.P. 3004.*  Prepetition creditors are bound by the provisions of a confirmed plan whether or not the claim of such creditor is provided by the plan and whether or not such creditor has objected to, accepted or

---

[13]     The court in *In re Jemison*, 2007 WL 2669222 (Bankr. N.D. Ala. 2007) recognized many of the concerns that arise when attempting to utilize the bankruptcy estate to retain all property postconfirmation whether or not it is necessary to actually fund the plan, noting for example that this could entangle the court in every minutia of a debtor's postconfirmation financial activities. *Id.* at *5.  *See also In re Jones*, 369 B.R. at 750.  The *Jemison* court noted that the desire to keep all of the debtor's property as "property of the estate," even after confirmation, is designed to protect debtors by the umbrella of the automatic stay throughout the plan term possibly originating from a suggestion in a respected treatise on Chapter 13 law.  *Id.* at *2, n. 6 (citing Lundin, *Chapter 13 Bankruptcy* (2d. Ed. 1994) §6.16 which recommends that language in the Chapter 13 plan should very specifically continue the estate to include all postconfirmation wages of the debtor).  Nevertheless, this Court, not unlike the *Jemison* court, has concerns as to whether such an approach is a proper usage of the Bankruptcy Code.  Additionally, it should be noted that Lundin's suggestion in this regard would appear to be at odds with the recognition elsewhere in the same treatise that *Section 366(b)* does not require relief from stay before utility service can be terminated in a Chapter 13 proceeding.  *Lundin* at Section 437.1.  *See reference* p. 12, above.  As the *Jemison* court noted in a point worthy of some consideration, in order to achieve a more appropriate result, while maintaining a balance between assuring appropriate plan funding and so as to avoid overextending the applicability of the stay, for purposes of confirmation the plan should include a directive to the effect that upon confirmation the "plan returns so much of that property to the debtor's control as is not necessary to the fulfillment of the plan." *Supra* at *6.  *(citations omitted)* For a different view on treatment of "property of the estate" in the postconfirmation stage of a Chapter 13 proceeding, see *In re LaFlamme*, 397 B.R. 194 (Bankr. D.N.H. 2008) (finding an "implicit right" under *11 U.S.C. §§ 1303 and 1306(b)* for Chapter 13 debtors to use property of the estate free of court control for "ordinary and necessary living expenses provided that use is not in bad faith"  but apparently without recognizing any concomitant right in a postpetition creditor to collect on any nonpayment without first seeking relief from stay.)  It is important to note that the case of *In re McConnell*, 390 B.R. 170 (Bankr. W.D. Pa. 2008) authored by the Honorable Jeffery A. Deller of this Court arrived at a result similar to the decision of *In re LaFlamme*.  This Court believes *McConnell* to be appropriately decided in light of the Chapter 13 Plan language currently used to describe property of the estate in this District.

rejected the plan. *See 11 U.S.C. §1327(a).*[14] As one consequence of being bound by the confirmed plan, the debt owed to such creditor is discharged upon completion of the plan. *See 11 U.S.C. §1328(a).*

    In sharp contrast, postpetition creditors cannot be forced to participate in a Chapter 13 plan, although they may elect to do so voluntarily. *11 U.S.C. §1305(a)(2)* provides that a "proof of claim may be filed by any entity that holds a claim against the Debtor ... that is a consumer debt, that arises after the date of the order for relief under this Chapter and that is for property or services necessary for the debtor's performance under the plan." The Court will assume that Dominion could have filed a proof of claim related to the Postpetition Account pursuant to this provision. However, Dominion did not file a proof of claim with respect to the Postpetition Account and it cannot therefore be forced to participate in the plan as to that obligation. *See, e.g., Lundin, supra,* at §281.1 n.8 (citing cases for the proposition that the holder of a postpetition claim is under no obligation to file a proof of claim and can control discharge of the claim by refusing to file a proof of claim). And in any event, Debtors in the present case have not attempted to force Dominion to participate in the plan by attempting to file a proof of claim on Dominion's behalf or modifying the plan to provide for the Postpetition Account.

    Under the facts of this case, the Court must therefore conclude that Dominion is not bound by the terms of the Debtors' plan with respect to the Postpetition Account, including any part of the plan that would purport to define the "property of the estate" beyond what is necessary to

---

[14]    *Section 1327(a)* provides that a confirmed plan binds the debtor and "each creditor." The term "creditor" is defined elsewhere in the Bankruptcy Code as an entity with a claim against the debtor that arose at the time of or before the order for relief concerning the debtor. *11 U.S.C. §101(10)(A)*. Thus, as to the Postpetition Account under these facts, it does not appear that Dominion was a "creditor" of the Debtors and the plan would not be binding on Dominion pursuant to *Section 1327(a)*.

make plan payments.  *See, e.g., In re Guevara*, 258 B.R. 59 (Bankr. S.D. Fla. 2001) (terms and conditions of confirmed chapter 13 plan were only binding on mortgagee to extent they provided for debt owed to mortgagee; debt for payment of increased amounts of taxes and insurance arose postpetition and were not provided for in plan, therefore plan was not *res judicata* as to the increased amounts sought); *In re Wilkoff*, 2001 WL 91624 (Bankr. E.D. Pa. 2001) (federal tax liability accrued after filing of bankruptcy petition and was thus a postpetition debt that was not discharged under the chapter 13 plan when the IRS had not filed a proof of claim under *Section 1305*).  The Postpetition Account in the present case represents a postpetition debt that is not provided for in the Debtors' plan and hence the plan is not binding on Dominion with respect thereto.[15]

The second question raised by the Debtors' position on the "property of the estate" issue is whether Dominion's termination of gas service can even be characterized as an improper attempt to exercise "dominion and control" over property of the estate.  Although the conclusion reached immediately above makes it, strictly speaking, unnecessary to even consider this question, a few comments are in order.  The Court does not view Dominion's described conduct as an attempt to exercise dominion or control over property of the estate.  Dominion has not claimed a right to any part of the Debtors' income or made any attempt to take possession of their home.  It has not sought to obtain a judgment against the Debtors related to the Postpetition Account, let alone attempted to execute on any judgment related to the Postpetition Account .  *See, e.g., In re Clark,* 69 B.R. 885, 890 (Bankr. E.D. Pa. 1987), amended on reconsideration in part, 71 B.R. 747 (Bankr. E.D. Pa. 1987)

---

[15]  The Court's decision in this regard is limited to the facts of this case, wherein the Dominion Rates and Rules clearly give Dominion the authority to close out the existing account and create a new postpetition account upon the filing of a bankruptcy.  The Court's conclusion might be different if there were no such authority or if a creditor were seen to have engaged in abusing the system by attempting to improperly divide a single claim into prepetition and postpetition claims to gain an unfair advantage.

(noting that the automatic stay does not prevent a creditor from obtaining a judgment against a

bankruptcy debtor for a claim that arose postpetition, although any attempt to execute on such

judgment could be a violation of *Section 362(a)(3)* or *(a)(4)*; citing *In re M. Frenville Co.*, 744 F.2d

332 (3d Cir. 1984), *cert. denied* 469 U.S. 1160 (1985)).  All Dominion did was elect to forego future

deliveries of gas to the Debtors because they had not paid for postpetition gas service.

Finally, Debtors state that the PUC has indicated that it may have no jurisdiction over

a debtor and utility while a chapter 13 case is ongoing.  *See, e.g.*, *Anyanwu v. Philadelphia Electric*,

1981 Pa. P.U.C. LEXIS 45, 55 P.U.C. 221 (1981).  Debtors proceed to argue that, in light of the

PUC's position in this regard,  if the Court were to "abdicate" its responsibility they would have no

forum to bring a claim challenging a demand for deposit or shutoff by a utility.  Assuming the

Debtor's representation as to the position of the PUC is correct, that is a fair point, but the Debtors'

concerns in this regard are misplaced because this Court has no intention of abdicating its

responsibility in any regard.

The Court recognizes that under *Begle*y Dominion remains bound to follow

applicable state law in carrying out the termination of service to the Debtors.  If there was a

contention by the Debtors that Dominion had not followed state law in the termination process, this

Court would be obliged to address that issue somehow, either by reviewing Dominion's actions itself

in the first instance or perhaps by directing the Debtor to attempt to seek relief from the PUC while

retaining the ability to return to this Court if the PUC refused to act.  *See, e.g., Begley*, *supra*, 760

F.2d at 50-52 (discussing the interplay between *Section 366* and PUC Regulations and jurisdictional

overlap between a bankruptcy court and the PUC regarding a utility termination).  In this case,

25

however, there is no contention of any violation of state law and the Parties have stipulated that

Dominion gave the proper notice. *See Consolidated Pretrial Statement, Stipulated Facts* at ¶35.[16]

### CONCLUSION

For the reasons stated above, summary judgment in favor of Dominion is appropriate.

Finding themselves in the circumstances presented, there was nothing to prevent the Debtors from

being proactive in dealing with the postpetition utility arrearage that threatened to lead to a

termination of their service. The Debtors could have sought a hearing in this Court prior to the

termination, or, they could have moved to amend their Plan to include the postpetition arrears.

*Jones*, 369 B.R. at 752. The one thing they could not do was simply ignore the problem, which

unfortunately, seems to be what happened here. Furthermore, it does not appear that Dominion

acted in a heavy-handed manner with respect to this whole situation. The termination was not done

in a rash manner but only after an extended period of delinquency and a number of notices had been

sent. Even after this case was filed, Dominion expressed a willingness to work with the Debtors to

make an acceptable payment arrangement in order to clear up the postpetition arrearage that had

accrued. The Court is hopeful that the same sentiment remains throughout this case and that the

Parties can come to an arrangement that will keep the gas flowing to the Debtors if a similar issue

---

[16]     As indicated earlier in the Opinion, Debtors originally claimed that they did not receive proper notice prior to
the termination. As a result, Dominion was directed to provide the Debtors with copies of the notices that were given. That exercise
has apparently satisfied the Debtors that proper notice was, in fact, given and received. It should be noted that at no time have the
Debtors asserted that Dominion was required by its Pennsylvania Tariff (formally titled "Rates and Rules Governing the Furnishing
of Natural Gas Services to Retail Customers") to continue providing service postpetition even in the absence of payment. In fact,
Dominion has made a point of alleging that its actions were in accord with the Tariff and the Debtors have admitted that fact. *See
Motion* at ¶¶ 4-5; *Response* at ¶¶ 4-5. Thus, this case does not include any contention that Debtors possessed a contractual right to
continued service.

arises in the future.  If they cannot, however, this Court may not stop Dominion from exercising its right to terminate service.[17]

## ORDER

**AND NOW**, this *9th* day of *February, 2009*,  based upon the findings of fact and conclusions of law issued pursuant to *Fed.R.Bankr.P. 7052* as set forth in the above *Memorandum Opinion*,  it is hereby **ORDERED, ADJUDGED and DECREED** that:

(1)    Paragraph 1 of the Order of May 6, 2008, Document No.6,  and Paragraph 1 of the Order of May 28, 2008, Document No. 16, are hereby **VACATED**.

(2)    The **Motion for Summary Judgment** filed by Dominion Peoples Gas Company, Document No. 23, is **GRANTED** and **JUDGMENT is ENTERED** in favor of Defendant, Dominion Peoples Gas Company, and against the Plaintiffs and Debtors, Michael Weisel and Lori Sue Weisel, the Court determining that Dominion Peoples Gas Company did not violate the automatic stay provisions of *11 U.S.C. §362* when it terminated gas service to the Debtors on or about April 9, 2008.  Accordingly, the *Expedited Complaint for Violation of the Automatic Stay* is **DISMISSED**.

---

[17]        The Court notes that the special provision in the *Pretrial Scheduling Order* requiring the Debtors to pay $200 each month to their attorney toward the original postpetition arrearage has resulted in full payment of the initial arrearage.  *See Order* dated December 19, 2008, Document No. 82.  As such, there may no longer be a valid basis under Pennsylvania law for Dominion to terminate service at least due to the initial postpetition arrearage giving rise to the filing of the *Complaint*.  Since this matter arose, the Debtors have committed 2 additional defaults in payment of postpetition arrearages on a "going forward" basis.  In the December 19, 2008 *Order*, so there would be no confusion in this regard, Dominion was allowed to pursue its state court remedy as to any future utility payment default without first seeking relief from this Court.

(3)     No damages, actual or punitive, are awarded against the Defendant, Dominion

Peoples Gas Company.  Each Party shall bear their own costs,  fees and expenses of litigation.


(4)     Any subsequent termination of service to the Debtors by Defendant,

Dominion Peoples Gas Company, shall be done in compliance with applicable Pennsylvania law.


Thomas P. Agresti
United States Bankruptcy Judge


Case Administrator to mail to:
        Ronda Winnecour, Esq., Ch. 13 Trustee
        Via CM:ECF e:mail
        Debtors
        Debtors'/Plaintiffs' Counsel
        Counsel for the Defendant

        John P. Vetica, Jr., Esq.
        600 Commerce Drive, Suite 601
        Moon Township, PA 15108

28